IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| LYLE BRIDGEWATER #1398768 | § | |
| v. | § | CIVIL ACTION NO. 9:07cv218 |
| TIMOTHY SIMMONS, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Lyle Bridgewater, proceeding *pro se*, filed this civil rights action under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. §636(c). As Defendants, Bridgewater sued Polunsky Unit Warden Timothy Simmons; Mark Duff, the chief of classification at the Polunsky Unit; Captain Xeaver King; Sgt. A.C. Wortham; and Sgt. Karen Kerstens.

An evidentiary hearing was conducted on March 18, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing and in his complaint, Bridgewater states that he arrived at the Polunsky Unit on May 9, 2007. He was sent to a section that had a lot of gang members, and was told by other prisoners that he had to "get with a gang or get off the unit." Bridgewater said that he was "not down with a gang." He told Sgt. Wortham and Sgt. Kerstens that his life was in danger, but nothing was done.

On August 7, 2007, Bridgewater says, he tried to stop a fight between an inmate named David Bolton and a member of the Aryan Brotherhood. Bolton was a member of a gang called the White Knights. Bridgewater said that Bolton asked him "whose side are you on," to which Bridgewater replied "none." Bolton hit him, and Bridgewater says that he fought back, injuring Bolton "pretty bad."

Bridgewater says that he received a disciplinary case. At the hearing, he asked Captain King, the disciplinary hearing officer, for placement in administrative segregation or to be transferred off of the unit. However, King said that he had not been informed, and so Bridgewater's statement "did not hold water."

Bridgewater reiterated that he had told Wortham and Kerstens that he was in danger. He said that he had problems with his cellmate, who was black, because his cellmate was "trying to run him." He said that at his disciplinary hearing, Kerstens said that she did not recall him, but later stated that she did.

Bridgewater stated that Bolton punched him in the nose "by accident," since he was trying to break up the fight, and that he then defended himself. At the disciplinary case, he got 45 days of cell, commissary, and recreation restrictions. After the case, he went before the unit classification committee and saw Warden Simmons and Mark Duff, the chief of classification. He told them that he wanted to be put in administrative segregation or to be transferred off the unit, but they would not listen to him. Instead, Bridgewater says, he was told that he would be moving to J Pod, another living area. He says in his complaint that this was still a general population housing area, and so he was still in danger from the White Knights.

After he arrived at J Pod, on August 14, another inmate approached him and asked his name. Later, another inmate told him "let's step into the shower and settle it." Bridgewater replied "settle what?" The other inmate then hit him in the face, breaking his nose. After this fight, Bridgewater says, he was transferred to the Estelle Unit.

After this fight, Bridgewater says, his grievance was investigated by Duff, the same person who had denied him earlier. He says that the Office of the Inspector General should have conducted an investigation and that the unit grievance procedures did not operate properly - he stated that he filed grievances which he did not get back and that Duff and Simmons should not have investigated.

In a written statement filed in this Court on September 27, Bridgewater provides additional details. He says that he arrived at the unit on May 9. He left on a medical chain at one point and returned to find himself reassigned to cell 7-H-33, with a black cellmate named Easter. He says that Easter said that he was a member of the gang called the Bloods and asked if Bridgewater was in a gang; when Bridgewater said no, Easter started trying to "run him" and tell him "how things were going to be." Bridgewater wrote to Duff and tried to talk to him, but was not successful. He talked to Lt. Tucker, who told him to "get with the building sergeant" and file a life endangerment complaint. The building sergeant the next day was Kerstens, and she told him to fill out an inmate request form, which he did. He later talked to Wortham, who told him to get with the building sergeant; Bridgewater replied that he had done so, and Wortham laughed and said "you know how many people want to get moved?"

On August 7, Bridgewater says, he got into a fight with Bolton, and was called before Captain King in a disciplinary hearing on August 13. A written statement by Bridgewater, saying that if he was put back into population his life would be in danger, was read into the record, but King said that while Bridgewater's statement may be true, it held no merit because he, King, had not been informed of the situation. After the disciplinary hearing, Bridgewater was moved to J Pod, where the confrontation with Johnston and Ferris took place.

On the same day as the disciplinary hearing, Bridgewater says, he went before the unit classification committee, which consisted of Warden Simmons, Duff, and an unknown lieutenant. He says that Simmons threatened him by saying that if Bridgewater had talked to Simmons the way he talked to the officers, Simmons "sure would have put hands" on him and "handled him a lot differently." Simmons then said that he was going to drop Bridgewater's custody level from G-2 to G-4. He asked the officers to read his statement, but they said that they were not judging the disciplinary case. He was placed back in general population on J Pod, where the assault took place.

Warden Pratt, a TDCJ official also present at the <u>Spears</u> hearing, testified that while there was video of one of the incidents, the investigator determined that there were too many inmates standing around to determine what happened. After the second assault on Bridgewater, an investigation was conducted and Bridgewater was transferred.

Nurse Barbara Hughes, a correctional nurse present at the <u>Spears</u> hearing, testified that Bridgewater was seen in the infirmary on August 15, 2007. At this time, he had a two-centimeter laceration on his nose with a possible fracture. He also had a laceration on his knuckle and multiple contusions, including a shoe sole mark on his head. X-rays proved negative, although these were not taken of his nose. Nurse Hughes said that normally surgery would not be done on a broken nose unless the break was severe. On August 7, the date of the first fight, Nurse Hughes said that the medical records show that Bridgewater had a laceration on his finger and a laceration on his knuckle, for which no sutures were necessary.

The TDCJ records show that on August 8, 2007, Officer Miles reported that Bridgewater told him that he had been in a fight with Bolton. On August 13, the day before the second assault, Officer Duff said that Bridgewater told him that he needed to speak with him and Duff told him to wait a few minutes, but when Duff returned, Bridgewater had left. That same day, Kerstens said that she had not received any inmate request forms from Bridgewater, nor had she spoken with him. The disciplinary case record contains a statement by Bridgewater that he had written to Duff and Kerstens asking for a transfer because he and his cellmate were not getting along.

On August 15, an investigator named Johnny Dixon wrote up an investigation summary. This summary says that Bridgewater said that his life was in danger because of an earlier altercation with Bolton. Bridgewater told Dixon that Bolton had paid the White Knight gang to kill him, and that on August 14, he was assaulted by two white inmates (identified as Chad Johnston and Kevin Ferris). These inmates followed him to the two row three pod J-section shower and began punching and kicking him, saying "this is for David." Dixon said in the summary that Bridgewater picked his assailants out of a photo lineup and that he, Dixon, had reviewed available video, but could not

verify the allegations because of the number of inmates standing around the shower. There was physical evidence, in the form of Bridgewater's injuries, to substantiate that an assault had taken place. Dixon notes that Bridgewater was placed in transient status pending further investigation.

## Legal Standards and Analysis

Bridgewater's primary claim is that the Defendants were deliberately indifferent to his safety; at the hearing, he specifically said that he was not complaining about the medical care which received, nor did he sue anyone over this medical care. The Fifth Circuit has held that prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. Davidson, 474 U.S. at 347-48.

More recently, the Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...

> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see also* Horton v. Cockrell, 70 F.3d 397, 400 (5th Cir. 1995) (inmate must show that he is incarcerated under conditions "posing a substantial risk of serious harm" and that the prison official's state of mind is one of "deliberate indifference" to the inmate's health or safety). Similarly, in Stokes v. Delcambre, 710 F.2d 1120, 1127 (5th Cir. 1983), the jailers made clear that they expected assault to occur and were unconcerned about it, which was held to be deliberate indifference.

In this case, Bridgewater has not shown that he was the victim of deliberate indifference to his safety, as the term is defined by the Fifth Circuit and the Supreme Court. The situation which he described is more akin to that in Davidson, and whether or not the prison officials were negligent with regard to his safety, he has not shown that they were deliberately indifferent to him.

In addition, with regard to the fight that Bridgewater had with Bolton, he has not shown that this was a foreseeable consequence of the prison officials' failure to take action. The Fifth Circuit has held that if state actors knowingly place a person in danger, the Due Process Clause of the Constitution has been held to render them accountable for the *foreseeable* injuries that result from their conduct. Johnson v. Dallas Independent School District, 38 F.3d 198, 200 (5th Cir. 1994) (emphasis added). In this case, even assuming that the Defendants "knowingly placed him in danger," a highly dubious assumption, Bridgewater states that he had complained about his cellmate. He then says that his fight with Bolton came about because he had intervened to try to stop a fight in which Bolton was involved, and Bolton accidentally hit him in the nose, and so he defended himself. This is hardly a foreseeable consequence arising from Bridgewater's complaints with his cellmate. *See also* Urbach v. U.S., 869 F.2d 829, 831 (5th Cir. 1989). Bridgewater's claim concerning his fight with Bolton are without merit.

Bridgewater also complains that after the fight with Bolton, the Defendants were indifferent to his safety, resulting in another assault about a week later. However, he concedes that he was moved off of the housing area where had the fight with Bolton, and was moved to J Pod. The fact that this action was not what Bridgewater wanted does not mean that it was done with deliberate indifference to his safety. Nor does the fact that Bridgewater was assaulted despite being moved to a different housing area show that the decision to move him was motivated by deliberate indifference to his safety. Rather, it is clear that the prison officials did try to protect him, albeit unsuccessfully, by moving him away from Bolton, the inmate with whom he had the fight.

In analyzing deliberate indifference in the context of medical care, the Fifth Circuit has explained that

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."

Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001).

In this case, the prison officials did not refuse to offer him protection or ignore his complaints, but moved him to another living area. They did not show a wanton disregard for his safety, as was done in Stokes v. Delcambre, but took action through the move. Even if the failure to move him to administrative segregation or to transfer him to a wholly different unit may have been negligent, Bridgewater has wholly failed to show that the Defendants were deliberately indifferent to his safety.

The fact that Bridgewater was subsequently assaulted and sustained injuries as a result also does not in itself show that he was the victim of deliberate indifference to his safety. The Fifth Circuit has held that complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid claim under the Civil Rights Act even if such complaints could be valid under state law. See Bowie v. Procunier, 808 F.2d 1142 (5th Cir. 1987).

In order to prevail on his lawsuit, Bridgewater must show not only that he suffered harm, but also that this harm was the result of deliberate indifference on the part of the Defendants. Because he has not made such a showing, he has not set forth a valid claim under 42 U.S.C. §1983, and so his claim on this point should be dismissed.

Bridgewater complained at the evidentiary hearing that the grievance procedures did not operate correctly and that the investigations were not properly done. The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); *see also* Cole v. Abbott, slip op. no. 03-41499 (5th Cir., March 4, 2004) (unpublished), *citing* Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir. 1995) (no state-created liberty interest in grievance procedure). Similarly, a number of other courts have held that inmate grievance procedures are not constitutionally required, and so violations of such procedures do not deprive inmates of constitutionally protected rights. Spencer v. Moore, 638 F.Supp. 315, 316 (E.D. Mo. 1986), *citing* O'Bryan v. County of Saginaw, 437 F.Supp. 582 (E.D. Mich. 1977); *see also* Azeez v. DeRobertis, 568 F.Supp. 8 (N.D. Ill. 1982). In Mann v. Adams, 855 F.2d 639 (9th Cir.), *cert. denied* 109 S.Ct. 242 (1988), the Ninth Circuit Court of Appeals noted that inmates have no legitimate claim of entitlement to a grievance procedure, and thus no protected liberty interest exists. This position was also taken by the Eighth Circuit in Flick v. Alba, 932 F.2d 728 (8th Cir. 1991). Because Bridgewater does not have a liberty interest in the prison grievance procedure, the fact that this procedure did not operate as he believed that it should have does not set out a constitutional claim.

Bridgewater also indicated that at the unit classification hearing, Warden Simmons threatened him. He says that Simmons told him that if he, Bridgewater, had talked to Simmons like Bridgewater had talked to the officers, that Simmons "sure would have put his hands on him." However, the Fifth Circuit has held that mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations. Bender v. Brumley, 1 F.3d 271, 274 n.3 (5th

Cir. 1993); McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983).  The use of words, no matter how violent, does not comprise a section 1983 violation.  Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2nd Cir. 1973).   In this case, Simmons did not even overtly threaten Bridgewater, but merely said that *if* Bridgewater had spoken in a certain way to him, that Simmons would have responded, apparently in a violent way.  While the Court does not condone the use of threats directed at any person, it is clear that this contention does not set out a constitutional claim.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Bridgewater's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **13** day of **May, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE